O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>MANUEL PEREZ,<br><br>                    Defendant. | Case No.:  2:22-cr-00333-MEMF<br><br>**ORDER DENYING MOTION FOR NEW TRIAL [ECF NO. 116]** |

Before the Court is the Motion for New Trial filed by Defendant Manuel Perez. ECF No. 116. For the reasons stated herein, the Court hereby DENIES the Motion for New Trial.

/ / /

/ / /

/ / /

## I. Background

This case concerns a two-count criminal indictment against Defendant Manuel Perez ("Perez") for (1) abusive sexual contact in violation of 18 U.S.C. §§ 2244(b) and 7(8), and (2) simple assault of an individual under the age of sixteen in violation of 18 U.S.C. §§ 113(a)(5) and (7)(8). Indictment, ECF No. 1.

### A. The Incident

On March 31, 2022, Perez was traveling aboard the Carnival Miracle cruise to Mexico. Two sisters—19-year-old A.A.S. and 13-year-old sister, K.A.—were also on the cruise. A.A.S. and K.A. were unrelated to Perez and did not know him prior to March 31, 2022. On that day, Perez was sitting in a jacuzzi with, among other people, his seven-year-old intellectually disabled daughter, A.A.S., and K.A. *Id.* Perez was drinking. *Id.* The parties dispute what happened next.

The government maintains that, while in the jacuzzi, Perez touched both girls in violation of 18 U.S.C. §§ 112(a)(5), 2244(b), and 7(8). Relevant to this motion, the government maintains that Perez touched A.A.S. on her buttocks.

Perez denies that he touched A.A.S.'s buttocks and maintains that any touching was non-intentional. Perez also maintains that if he touched A.A.S. at all, it was only the outer side of her thigh. At trial, Perez's main defense was that he was intoxicated, and as such, did not intend to harass or abuse the victims.

### B. Perez's Prior Counsel, His Preparation for Trial, and His Trial Performance[1]

From the inception of the case, through trial, and until February 2023, Perez was represented by retained counsel—attorney Robert Helfend. ECF No. 116-1 ("Perez Decl."), ¶¶ 2, 24. At his first meeting with Helfend, Perez told Helfend that he could not remember anything about the events underlying the prosecution, and that Perez had been so inebriated during the incident that he blacked out. *Id.* ¶ 5. Perez also told Helfend that his lack of memory from the night of the incident frightened Perez, as it seemed too severe to be caused by drinking alcohol alone. *Id.* ¶ 7. Perez told Helfend that he suffered from obstructive sleep apnea and that he had a growth on his pituitary glands, as well as

---

[1] At the hearing on the Motion, the Court asked the government if they had any evidence that controverted the testimony in Perez's Declaration or Rebecca Abel's Declaration. The government did not.

other medical issues. *Id.* at ¶¶ 8, 9. Perez asked Helfend to investigate whether Perez's medical conditions could have contributed to Perez's blacked-out state. *Id.* at ¶ 9. Perez also told Helfend that Perez had medical records and he believed these records were relevant to Perez's state of mind (and therefore his defense), and asked Helfend to review the documents. *Id.* at ¶ 10. Helfend declined to review the documents, did not hire an expert to do so, and did not send Perez to doctors for medical testing. *Id.* at ¶¶ 11, 12. Prior to trial, Helfend and Perez agreed that Perez would not take the stand at trial, and consequently, did not prepare Perez to testify at trial. *Id.* at ¶ 15. Perez took the stand only minutes after he and Helfend discussed doing so for the first time. *Id.* at ¶ 18. During trial, Helfend's performance distressed Perez, as Perez felt that Helfend was sloppy and confused. *Id.* ¶ 16. Moreover, Perez noticed that Helfend was corrected by the judge multiple times in front of the jury. *Id.*

### C. Evidence at Trial and Verdict

The trial commenced on November 8, 2022. ECF No. 70.

At trial, the government presented evidence that Perez intentionally touched both victims for sexual purposes. Specifically, K.A. testified that Perez initially spoke to her to ask him to watch his daughter for him while he went to get a drink from the bar. ECF No. 103 ("Tr. 2") at 30:17–21. When Perez came back, he asked K.A. how old she was and whether she drank alcohol. Tr. 2 at 31:12–18. When K.A. said she did not drink, Perez asked, in a whisper, if she drank without her parents knowing. *Id.* K.A. said she did not. *Id.* K.A. then testified that Perez asked her if he "could get liquored up," which K.A. understood as Perez asking for her permission to get drunk in his presence. Tr. 2 at 32:11–13. K.A. then testified that Perez touched her knee with the back of his hand. Tr. 2 at 33: 7–25. K.A. testified that she then moved away and, out of discomfort, gave Perez a look that prompted Perez to scoot away from K.A. *Id.* K.A. testified that she went back to her original seat and Perez touched her again, this time, higher up on the lower half of her thigh. *Id.* K.A. testified that once Perez's daughter began distracting him, K.A. left the jacuzzi and went to ask her father to get ice cream so that she could have an opportunity to tell her father what Perez did, as K.A. felt that she was in a dangerous situation and could not sit in the jacuzzi any longer. Tr. 2 at 43:6–44: 8. K.A. testified that when she left with her father, Perez mouthed the words "don't tell" to

her. Tr. 2 at 45:5–11. Amanda Moore, another cruise-goer who is unrelated to Perez, K.A., and A.A.S., also testified that she saw Perez mouth "don't tell" to K.A. when K.A. joined her father. Tr. 2 at 229:2–7, 234:17–135:19.

A.A.S. also testified. A.A.S. testified that after K.A. left, Perez moved closer to A.A.S. Tr. 2 106:16–107:8. A.A.S. then testified that Perez confirmed that she was 19-years old. Tr. 2 at 107:20–24. A.A.S. testified that Perez asked her to keep an eye on his daughter, and then apologized to her, at which point A.A.S. brushed off the apology and Perez asked her if she even knew why he was apologizing. Tr. 2 at 108:3–23. A.A.S. testified that Perez then touched A.A.S.'s right thigh with his left hand, a touch A.A.S. initially believed accidental until Perez moved his hand up A.A.S.'s thigh and made contact with her right buttock. Tr. 2 at 109:11–110:22. A.A.S. showed the jury, with her own hand on her own body, where Perez's hand touched her on her buttocks. Tr. 2 at 114:11–15. A.A.S. testified that she then punched Perez in the nose, and yelled, "Don't [expletive] touch me." Tr. 2 at 115:15–116:23. A.A.S. testified that Perez then repeatedly apologized. Tr. 2 at 117:8–13.

Carnival's security officer onboard the Carnival Miracle that day, Leo Ranon, testified that, immediately after the incident, he walked after Perez and asked Perez to stop and talk. Tr. 2 at 182:19–183:2. Ranon testified that although Perez stayed for a brief moment, Perez left the jacuzzi area, and Ranon followed. Tr. 2 at 183:23–184:3, 186:1–10. Ranon testified that Perez rushed away his daughter, pushed her in a stroller, and refused Ranon's requests that he stop. Tr. 2 at 193:14–25, 194:22–195:3. Ranon also testified that Perez did not answer any of his questions until Perez reached the outside of his cabin. Tr. 2 at 195:20–196:8. Ranon testified that Perez walked in a straight line, did not stumble, and did not slur his speech. Tr. 2 at 197:10–198:5. Ranon also testified that when they reached Perez's cabin, Perez said "sorry" about the "inappropriate" way he behaved in the jacuzzi; Ranon emphasized that Perez specifically used the word "inappropriate." Tr. 2 at 196:3–197:2. Ranon further testified that only once Carnival's staff captain came to interview Perez inside Perez's cabin did Perez begin slurring his speech. Tr. 2 at 198:3–5; 201:18–25.

At trial, Perez took the stand. *See* ECF No. 105 ("Tr. 3") at 60:15–17. Perez testified that he was drunk when he entered the jacuzzi. Tr. 3 at 81:3–16. Perez further testified that he blacked out and could not recall his encounter with K.A. or A.A.S., including putting his daughter in his stroller,

walking away, and talking to security. Tr. 3 at 86:18–89:25. Perez's sister, Veronica Suarez, also testified at trial. Suarez testified that on the night of the incident, Perez called her but she could not understand him because his speech was slurred. Tr. 3 at 35:5–13. Suarez also testified that when she went to Perez's room, he reeked of alcohol, was not making any sense, and could not focus. Tr. 3 at 37:6–16, 45:22–46:4. Suarez testified that she had never seen Perez in such a state, and that Perez was exceedingly intoxicated. Tr. 3 at 39:3–12.

On November 10, 2022, the jury found that Perez was guilty of both counts. ECF No. 78.

### D. Post-Trial

Shortly after the verdict was rendered, Helfend left for vacation. Perez Decl. at ¶ 19. When Helfend returned, Perez, who was unaware of the possibility of a motion for new trial, told Helfend that he wanted to challenge and/or appeal the verdict. *Id.* at ¶ 20. Helfend discouraged Perez and began preparing for sentencing. *Id.* at ¶¶ 20, 23. Perez then fired Helfend. *Id.* at ¶ 24.

On March 10, 2023, the Court appointed Rebecca Abel as Perez's counsel. *Id.* at ¶ 27. Perez told Abel he wished to file a motion for a new trial and relayed his medical history to Abel. *Id.* at ¶¶ 27, 28. On October 6, 2023, Perez filed the instant Motion for New Trial. ECF No. 116 ("Motion" or "Mot."). The Motion is fully briefed. ECF Nos. 135 ("Opposition" or "Opp'n"), 136 ("Reply"), 137-1 ("Sur-Reply").

The Court held the hearing on the Motion on April 11, 2024. ECF No. 140. Because the Motion was based, in part, upon reports by two purported experts who reviewed Perez's medical records, at the hearing, defense counsel advised the Court that counsel would file Perez's medical records under seal after the hearing. On April 15, 2024, Perez filed an ex parte application requesting a Court order allowing Perez to file his medical records under seal. ECF No. 139. The Court granted the ex parte application on April 16, 2024. ECF No. 141.

## II. Applicable Law

Under the Federal Rules of Criminal Procedure, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The time limit for a defendant to bring such a motion is tied directly to the grounds of the motion—if the defendant makes his or her motion on newly discovered evidence, the defendant has three years from the

verdict to move for a new trial; however, if the defendant makes his or her motion on any other grounds, then the motion must be filed within 14 days after the verdict is rendered. Fed. R. Crim. P. 33(b). However, the Court may excuse compliance with a deadline that has passed if "the party failed to act because of excusable neglect." Fed. R. Crim. P. 45(b)(1)(B).

### III. Discussion

Perez moves for a new trial on the grounds of newly discovered evidence, instructional error, and ineffective assistance of counsel. *See* Mot. at 2. As the Court explains further below, the expert reports of Dr. Ryan O'Connor, M.D. (ECF No. 116-3, "O'Connor Report") and Dr. Merrill Mitler, Ph. D. (ECF No. 136-3, "Mitler Report") are not newly discovered evidence. The Court also does not find any errors in the jury instructions. Finally, the Court finds that Perez has not established ineffective assistance of counsel by Helfend.

#### A. The O'Connor and Mitler Reports Are Not Newly Discovered Evidence

"To prevail on a Rule 33 motion for a new trial based on newly discovered evidence, a defendant must satisfy a five-part test: '(1) the evidence must be newly discovered; (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3) the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative nor merely impeaching; and (5) the evidence must indicate that a new trial would probably result in acquittal.' [Citation]." *United States v. Harrington*, 410 F.3d 598, 601 (9th Cir. 2005) (citation omitted).

The first factor—that the evidence must be newly discovered—weighs against granting Perez's Motion. Both the Mitler and O'Connor Reports relate to Perez's pre-existing medical conditions, namely, his diagnoses of obstructive sleep apnea and pituitary microadenoma. *See* ECF Nos. 116-3 at 2–3 (discussing Perez's medical background), 136-3 at 2 (also discussing Perez's medical background). As Perez admits, he was aware of these medical conditions and communicated them to his counsel at the time, Helfend. Perez Decl. ¶¶ 8, 9. The Ninth Circuit has held that where, as here, the underlying facts relevant to the newly discovered evidence were within the defendant's knowledge and "could have been substantiated with the exercise of reasonable diligence, the evidence is not newly discovered." *Baumann v. U.S.*, 692 F.2d 565, 580 (9th Cir. 1982). Perez

argues that *United States v. Escobar*, 68 F. App'x 836, 837 (9th Cir. 2003) counsels in favor of granting a new trial because there, the Ninth Circuit affirmed the grant of a new trial where the defendant's counsel discovered after trial that defendant's "IQ fell within the lowest 2 percent for individuals of his age group." *Id.* There, prior to trial, the defendant was evaluated by a psychiatrist who told defense counsel that defendant was of "low to average intelligence and that he had no mental defect." *Id.* Escobar is a non-binding, unpublished decision, and, as such, contains very little discussion of the underlying facts, making it difficult to apply here. Furthermore, the question before the Ninth Circuit was whether it was an *abuse of discretion* for the district court to grant the motion for a new trial—which is obviously not the same as determining that a new trial was *required* under those facts. Nevertheless, it appears that the Ninth Circuit determined that the subsequent discovery that defendant's IQ was drastically lower *was* newly discovered evidence because it was different information from the earlier assessment that the defendant's IQ was low to *average*. *See id.* Here, in contrast, Perez knew before trial that he had medical conditions *and* he believed that his medical conditions were relevant to his state of mind during the incident. Perez Decl. ¶¶ 8–10. Therefore, to the extent that the reports identify the medical conditions and that they may be relevant to his state of mind, they are not new.

Perez also argues that expert reports evaluating a defendant's preexisting symptoms that relate to the defendant's ability to form the mens rea required for a crime inherently qualify as newly discovered evidence. Reply at 2–3. The cases do not so hold. As the Court already stated, in *Escobar*, the determination of the defendant's actual IQ *was* new information because it was very different from the earlier assessment. *Escobar*, 68 F. App'x at 837. Next, in *Nagell v. United States*, the defendant had concealed the crucial facts from his counsel and had done so because he was "suffering from a mental disorder which caused, if not compelled, [the concealment]." *Nagell v. U.S.*, 354 F.2d 441, 448–49 (5th Cir. 1966). Finally, *United States v. Massa* is also distinguishable from the present case. In *Massa*, the defendant's psychiatrist determined, after trial, that the defendant suffered from a condition called "magical thinking." *U.S. v. Massa*, 804 F.2d 1020, 1022 (8th Cir. 1986). Although the facts underlying the diagnosis were known to the defendant, the diagnosis was new, and the psychiatrist was only able to form his opinion after counseling the

defendant for over eighteen months. *Id.* Here, by contrast, Perez not only knew of his medical conditions, but also suspected that his conditions affected his state of mind during the incident. Perez Decl. ¶¶ 8–10. Again, this convinces the Court that the reports are not newly discovered evidence.

Thus, the Court finds that Perez has not shown that the Mitler or O'Connor Reports are newly discovered evidence.

However, even if the O'Connor and Mitler Reports were newly discovered evidence, the Court also finds that Perez has still failed to show, at minimum, the fifth *Harrington* factor—that the evidence must indicate that a new trial would probably result in acquittal. Based upon the arguments at the hearing, the Court understands that Perez's argument concerning his medical condition is that Perez was engaged in sleepwalking or sleeptalking—that is, that Perez carried out certain actions without intention or control. But the Reports do not support this.

The Mitler Report states that, in Dr. Mitler's opinion, Perez's "fatigue, sleep apnea, bupropion and alcohol intoxication adversely influenced Mr. Perez's judgment and adversely affected his ability to resist impulsive behaviors . . . ." Mitler Report at 3. In the O'Connor Report, Dr. O'Connor states that "Though the specifics are beyond my [Dr. O'Connor's] specialty, I am aware of an association of Obstructive Sleep Apnea with symptoms such as retrograde amnesia, hypnagogic hallucinations, automatic behavior, and fluctuating personality changes that may be relevant to this case. These symptoms can be exacerbated by alcohol use." O'Connor Report at 3. Neither Dr. Mitler nor Dr. O'Connor examined Perez. O'Connor Report at 2; Mitler Report at 1.[2] The Court also notes that Dr. Mitler is not a medical doctor and Dr. O'Connor is an emergency room physician. Furthermore, the reports do not discuss the severity of Perez's sleep apnea or the likelihood that the amount of alcohol Perez consumed on March 31, 2022, exacerbated his issues (or even how much alcohol Perez would have to consume to exacerbate his symptoms). *See generally* O' Connor Report; Mitler Report.

The Court has also reviewed Perez's medical records, which Drs. Mitler and O'Connor examined in drafting their reports. The medical records span from 2013 to 2022 (post-incident).

---

[2] Perez admitted this fact at the hearing on the Motion.

Although the medical records confirm that Drs. Mitler and O'Connor accurately recited the diagnoses and complaints found in the records, they also reveal that Perez did not report experiencing blackout episodes until after the incident. The Court therefore finds that it is not probable that the jury would credit these reports and acquit Perez even if they received this evidence.

Moreover, the jury heard (and appeared to believe) substantial evidence that Perez was in control of his faculties and that he was engaging in intentional, sexual behavior, not unintentional automatic behavior. Specifically, the jury heard the following testimony:

- Perez asked the girls their ages prior to touching them (Tr. 2 at 31:12–18, 107:22–108:2);

- Perez asked K.A.—a 13-year-old child—whether she drank (Tr. 2 at 31:12–18);

- Perez asked K.A.—a 13-year-old child—for permission to "get liquored up" (R. 2 at 32:9–14);

- Perez mouthed "don't tell" at K.A. after she exited the jacuzzi to meet her father (Tr. 2 at 45:10–11)—a fact which was testified to not just by K.A. but also by an unrelated third party;

- Perez rushed away afterwards and managed to navigate the stairs with his daughter in her stroller (Tr. 2 at 193:16–23);

- Perez spoke coherently to security (Tr. 2 at 197:22–198: 5); and

- Perez said "sorry" for the "inappropriate" way in which he behaved at the jacuzzi (Tr. 2 at 196:3–197:2).

The jury also heard considerable testimony in support of Perez's position that he had blacked out:

- Once Carnival staff were in Perez's cabin, Perez began slurring his speech (Tr. 2 at 201:18–25) (testimony by Carnival's security);

- Perez did not recall the incident (Tr. 3 at 87:15–23 );

- Perez drank (two margaritas with one extra shot, seven[3] 16-ounce beers, and a tequila shot) (Tr. 3 at 71:2–5, 73:1–14, 73:25–74:14, 81:6–89:25) (testimony by Perez);

---

[3] At trial, Perez's counsel presented Perez with a receipt for three, 16-ounce beers purchased at around 8:25 p.m. on the night of the incident. However, Perez could not recall if he had purchased the beers and said the signature did not look like his. Tr. 3 at 85:6–86:2. As such, the Court does not count these three beers in the total.

9

- Perez was slurring his speech when he called his sister, Veronica Suarez, the night of the incident ( Tr. 3 at 35:5–13) (testimony from Suarez);

- When Suarez went to see Perez that night, he reeked of alcohol and was having trouble focusing (Tr. 3 at 37:9–16);

- Suarez had never seen Perez so intoxicated (Tr. 3 at 39:5–16); and

- Perez had an exemplary record with the Probation Department and had received no complaints of inappropriate behavior with juveniles although he had worked with youth for years (Tr. 3 at 44:14–45:5, 63:12–23).

In light of the limitations of the reports and the full body of evidence that the jury heard, the Court does not find that presentation of the O'Connor or Mitler Reports would have probably resulted in an acquittal. They certainly would not have supported Perez's current theory that he was in a sleepwalking or sleeptalking state during the incident. Neither report explained the other evidence that the jury heard regarding Perez's conduct as consistent with being in a sleepwalking or sleeptalking state. Moreover, neither the O'Connor Report nor the Mitler Report concluded that Perez was in a sleepwalking or sleeptalking state that night (or even discussed these concepts in any detail).[4]

The Court thus DENIES Perez's Motion on the grounds of newly discovered evidence.[5]

### B. The Jury Instructions Were Not Erroneous

Perez also bases his Motion on purported errors in the jury instructions. Specifically, Perez argues that there were three defects with the jury instructions: (1) Jury Instruction No. 18 misled the jury in believing voluntary intoxication was irrelevant to the "intentional touching" element of abusive sexual conduct (Mot. at 8); (2) Jury Instruction No. 16 was an inappropriate constructive amendment of the indictment (Mot. at 10); and (3) the jury instructions did not define the crucial term "buttocks," which Perez argues is susceptible to different interpretations by different people

---

[4] The article attached to the O'Connor Report, ECF No. 116-4, mentions that sleepwalking and sleeptalking are potential symptoms of those with sleep apnea. Christian Guilleminault, <u>Obstructive Sleep Apnea Syndrome: A Review</u>, 10 Psychiatric Clinics of North America 4, 614 (1987). However, the topic is only briefly mentioned.

[5] The Government argues that Perez cannot base his "newly discovered evidence" argument on ineffective assistance of counsel. The Court agrees. *See United States v. Hanoum*, 33 F.3d 1128, 1131 (9th Cir. 1994). However, the Court also notes that Perez does not appear to his base his Motion on the "newly discovered evidence" that Helfend rendered ineffective assistance of counsel. *See* Reply at 11, n.2.

(Mot. at 13). The Court first evaluates whether Perez's Motion is timely, and then turns to the arguments concerning the jury instructions.

i. Perez's Motion is Timely

Where a defendant moves for a new trial on grounds other than newly discovered evidence, the motion must be filed within 14 days after the verdict is rendered. Fed. R. Crim. P. 33(b). However, a court may extend the time for filing such a motion of the defendant failed to act because of excusable neglect. Fed. Crim. P. 45(b)(1)(B). Courts determine whether "neglect" was excusable by evaluating the factors found in *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993)—that is, (1) the danger of prejudice to the opposing party, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, and (4) whether the moving party in good faith. *Id*. Although it does not appear that the Ninth Circuit has considered the question of whether ineffective assistance of counsel can constitute excusable neglect, some of our sister circuits have considered the issue within the *Pioneer* framework and found that it can. *See, e.g., U.S. v. Munoz*, 605 F.3d 359, 369–71 (6th Cir. 2010) (considering ineffective assistance of counsel in evaluating the reason for the delay).[6]

Here, there is danger of prejudice to the government in that the government would have to prepare and present its case again, should the Court grant Perez's Motion. However, this prejudice is unaffected by the eleven-month delay, as Perez's challenge does not require the government to start its case from scratch—that is, the government need not engage in further, if any, investigation or interview witnesses.

The second factor, the length of the delay—eleven months—is quite long, but as Perez points out, his current counsel, Abel, came on about three to four months after the verdict was rendered and had to review, among other things, the transcripts in this case, which were not produced until July 25, 2023. ECF No. 113. Thus, some delay was unavoidable.

---

[6] The Court notes that "ineffective assistance," in the context of evaluating excusable neglect, does not appear to mean the same as ineffective assistance of counsel in evaluating a Sixth Amendment argument, and is instead focused on considering whether the defendant's counsel's errors are excusable neglect. *See U.S. v. Munoz*, 605 F.3d 359, 369–71 (6th Cir. 2010) (considering certain omissions by counsel as "ineffective assistance").

The Court analyzes the remaining two factors—the reason for the delay and good faith—together. The Motion was delayed in part because of Perez's prior counsel, who appears to have discouraged Perez from challenging the verdict in any way. The Motion was also delayed in part because Perez's current counsel had to gather all the relevant materials, some of which were not ready until late July 2023, to begin her review and assessment of Perez's options. Furthermore, there is no showing that Perez brings the current Motion in bad faith.

Balancing the *Pioneer* factors, the Court finds that the factors weigh in Perez's favor, that his delay was due to excusable neglect, and therefore, that the Motion is timely.

### ii. Jury Instruction No. 18.

Where the defendant fails to raise an issue at trial, the issue is reviewed for plain error. *United States v. Mickey*, 897 F.3d 1173, 1183 (9th Cir. 2018). Jury "[i]nstructions are viewed in the context of the overall charge," and the court must inquire into "'whether the instructions as a whole are misleading or inadequate to guide the jury's deliberations.'" *U.S. v. Keyser*, 704. F.3d 631, 641 (9th Cir. 2012). That is, a "defendant is entitled to have his theory fairly and adequately covered by the instructions but is not entitled to an instruction in a particular form." *Id.* at 641–42.

To convict a defendant of abusive sexual contact, the government must prove that the defendant engaged in "sexual contact," which is defined as:

> the *intentional* touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person *with an intent* to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

18 U.S.C. § 2246(3).

Abusive sexual contact requires both an intentional touching and an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. *See U.S. v. Sneezer*, 900 F.3d 177, 178–77 (9th Cir. 1990) (finding that abusive sexual contact is not a lesser-included offense of attempted sexual abuse because abusive sexual contact has a specific attempt not required for abusive sexual contact).

Perez argues Jury Instruction No. 18—the instruction related to his diminished capacity defense—did not instruct the jury that the jury could consider Perez's intoxication in deciding

whether the government had proven beyond a reasonable doubt that Perez intended to touch A.A.S. Mot. at 9. By excluding any mention of the jury's ability to consider Perez's intoxication in deciding whether Perez intentionally touched A.A.S., the jury was, per Perez, misled to believe that they could only consider Perez's intoxication in connection with his intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. The government argues that Perez did not put forth any evidence or argument that because he was intoxicated, he lacked intent to touch A.A.S. Opp'n at 13. Prior to trial, the parties jointly requested the diminished capacity instruction in the form it was given. ECF Nos. 59 at 1, 46; 61 at 1, 46. At trial, Perez's attorney focused on tying his diminished capacity to his intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. *See* Tr. 3 at 195:15–25 ("[Y]ou can consider evidence of Manuel's intoxication in deciding whether the Government provide beyond a reasonable doubt that he acted with the intent required. . . ."); 197:12–18 ("He didn't touch her on her butt. And even if he did, he didn't do so with the intent to humiliate her . . . Why? Because he . . . was drunk."); 203:24–204:4 ("[T]he Government must prove beyond a reasonable doubt that Manuel touched the butt . . . of [A.A.S.] and if he did so, it was done with the intent to abuse her, humiliate her . . . ."); 204:5–8 ("Voluntary intoxication, ladies and gentlemen, *is a defense of the specific intent to abuse,* humiliate, and harass or even to gratify the sexual desires of any person.").

      Here, the Court finds that, at trial, Perez's counsel focused on Perez's intoxication as it related to his lack of intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. As such, at trial, Perez's attorney did not put forth any evidence or argument that Perez, due to his intoxication, could not or did not form the requisite intent to touch either K.A. or A.A.S. besides a few stray references to "grazing" the victims with his hand. Thus, the scope of Perez's diminished capacity defense was limited to his inability to form the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person, and did not include his intention to touch either of the victims. *United States. v. Washington*, cited by Perez, is distinguishable. In *Washington*, the Ninth Circuit reversed and remanded an assault conviction where the district court erroneously gave the jury instructions for assault but omitted reference to the intent to do bodily harm, a required element. *U.S. v. Washington*, 819 F.2d 221, 226 (9th Cir. 1987).

The present situation is not analogous, as the jury instruction here relates to a *defense*, the parameters of which are defined by the defendant's case and theory.

Perez was entitled to a jury instruction explaining the defense he presented. There is no authority suggesting that it was error for the Court to fail to give an instruction he did not request, regarding a defense theory he did not present, and for which there was little to no evidence. There was no error in failing to give this instruction.

The Court thus DENIES the Motion on this ground.

### iii. Jury Instruction No. 16.

"A constructive amendment occurs 'when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them.'" *U.S. v. Alvarez-Ulloa*, 784 F.3d 558, 570 (9th Cir. 2015). For a constructive amendment, the "jury instructions must 'diverge materially' from the indictment and evidence must have been 'introduced at trial that would enable the jury to convict the defendant for conduct with which he was not charged.'" *Id.*

Perez occurs that constructive amendment occurred because in the indictment, he was charged with touching one specific body part—A.A.S.'s buttocks. However, the relevant jury instruction (Instruction No. 16) lists more body parts (genitalia, anus, groin, breast, inner thigh). The Government argues that no constructive amendment occurred because all the evidence and witness testimony concerned A.A.S.'s buttocks and that, although the parties disagree whether Perez touched A.A.S. at her hip or upper thigh, that distinction is irrelevant because "hip" and "upper thigh" are not included in the definition of sexual contact. Opp'n at 15, 16. As such, the jury could not render a guilty verdict unless they found that Perez touched A.A.S. on her buttock.

Jury Instruction No. 16 did not invite the jury to convict Perez for conduct with which he was not charged. Although some of the testimony elicited at trial referenced the victims' thighs, the prosecution or the Court always made clear to the jury that the victims' *outer*, not *inner* thigh was touched. *See, e.g.*, Tr. 2 at 112: 13–14 ("So how do you know that he touched your butt and not just your outer thigh?"), 114: 11–15 ("Sorry, the record will reflect that the witness pointed to the outer

thigh . . . ."). As such, the jury could not have convicted Perez on any other ground, as neither hip nor outer thigh are part of the jury instructions.

The Court thus DENIES the Motion on this ground.

        iv.   <u>The term "buttocks" is not susceptible to multiple meanings.</u>

Perez also argues that he is entitled to a new trial because the jury instructions did not include a definition of the term "buttocks." If there is a risk that jurors could ascribe different meanings to words in jury instructions, then a district court may need to provide a definition for the word. *See U.S. v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000). However, "the district court need not define common terms that are readily understandable by the jury." *Id.*

Perez argues that the term "buttocks" is open-ended as to the parameters of the term, and that the government used this ambiguity to its advantage and changed an objective element—whether A.A.S.'s buttocks were touched—to a subjective question—whether A.A.S. believed her buttocks were touched. Mot. at 13, 14. The Court does not find that "buttocks" is an open-ended term, that the jury substituted A.A.S.'s belief for their own determination, or that the use of the jury's own anatomy renders the term "buttocks" susceptible to multiple interpretations. On average, people have a common understanding as to what part of the body constitutes the "buttocks," and the term is not subject to multiple interpretations. What the government did point to was the testimony of A.A.S. that she believed her buttocks were touched—together with the fact that jurors know that what their buttocks are—as evidence that A.A.S. should be believed that her buttocks were touched. This case is unlike *Galbez-Guerrero*, cited to by Perez, where the term "marriage" was subject to multiple interpretations depending on the governing jurisdiction. *U.S. v. Galvez-Guerrero*, 455 Fed. Appx. 749, 751 (9th Cir. 2011).

The Court thus DENIES the Motion on this ground.

### C. Helfend Did Not Render Ineffective Assistance as Perez's Counsel

The Sixth Amendment guarantees a right to counsel in criminal prosecutions. *Strickland v. Washington*, 466 U.S. 668, 684–85 (1984). The "right to counsel" is not narrowly construed as merely providing a right to have an attorney "present at trial alongside the accused," but broadlyas "the right to the effective assistance of counsel." *Id.* at 685–86. To succeed on a claim for ineffective

assistance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. However, "[j]udicial scrutiny of counsel's performance must be highly deferential," and a "a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689. Courts "[m]ust indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." A defendant "must [also] show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Generally, challenges to the effectiveness of counsel are reviewed in habeas proceedings under 28 U.S.C. § 2255. *U.S. v. Moreland*, 622 F.3d 1147, 1157 (9th Cir. 2010). However, if such a claim "is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding." *U.S. v. Steele*, 733 F.3d 894, 898 (9th Cir. 2013).

Perez argues that Helfend was ineffective for several reasons, including but not limited to, Helfend's failure to: (1) file any briefing, including a response to the government's trial brief; (2) interview witnesses; (3) conduct an investigation; and (4) failing to properly articulate the law to the jury. Mot. at 18, 19. However, the record before the Court tells a slightly different story. For example, Perez argues that Helfend did not know the names of any witnesses until the final pretrial conference, and that Helfend did not interview any witnesses. However, it appears this may have been, in part, a trial strategy, as Helfend told the Court that he had spoken to the government "about witnesses to get from the cruise lines, because everything that I [Helfend] have from the Government is redacted . . . and I understand then from conversations with the Government that . . . most of these people are outside the jurisdiction of the U.S. so they wouldn't have to comply with a subpoena." ECF No. 113 7:7–22. As such, Helfend appears to have chosen not to attempt to interview certain witnesses based on his assessment that these witnesses would not have to comply with a subpoena. Helfend also explained that his responses to the government's trial memorandum were "actually noted by the Government in their filing." ECF No. 113 at 6:17–19.

Moreover, the Court does not find that Helfend's failure to argue that the diminished capacity defense should apply to both prongs of intent of sexual contact—that is, Perez's intent to touch and

intent to touch with a specific purpose—was highly prejudicial in the context of the evidence presented at trial. K.A. testified that Perez touched her multiple times (Tr. 2 at 39:12–16, 41:13–15), indicating an intent to touch. K.A. also testified that prior to touching her, Perez asked her how old she was and whether she drank. 31:12–18. K.A. also testified that Perez mouthed "don't tell" at her when she went to meet her father. Tr. 2 at 45:10–11. A.A.S. testified that Perez moved closer to her despite a vast amount of empty space in the jacuzzi (Tr. 2 at 108:16–107:8, 107:10–19), apologized to her and asked her if she knew why he was apologizing (Tr. 2 at 108:10–20), and that Perez touched her twice (Tr. 2 at 110:15–22). A cruise worker who followed Perez as he left the jacuzzi right after touching A.A.S. testified that Perez walked in a straight line, without stumbling, and did not appear tipsy. Tr. 2 at 197: 10–21. He also said "sorry" for his "inappropriate" behavior in the jury. Tr. 2 at 196:3–197:2. All of this testimony goes to showing that Perez's actions were not involuntary and that his intent was not innocent, but in fact sexual.

At the hearing, Perez's counsel emphasized Perez's argument that Helfend's failure to even investigate Perez's medical condition constituted ineffective assistance of counsel such that Perez is entitled to a new trial. Perez cites to *Sanders v. Ratelle*, 21 F.3d 1446 (9th Cir. 1994) in support of this argument. In *Sanders*, the Ninth Circuit stated that "counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how best to represent his client." *Id.* at 1456. If counsel does not conduct a reasonable investigation, "counsel has a duty . . . to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Here, Perez states, and the government does not dispute, that Helfend declined to review Perez's medical records, did not hire an expert to review the medical records, and did not send Perez to any doctors for medical testing. Perez Decl. ¶¶ 10–12. It appears to the Court that Helfend could have made a reasonable decision—in light of all of the evidence he possessed—that to pursue further medical investigations was unnecessary. But even assuming that Helfend did not conduct a reasonable investigation and that there was no justification as to why this particular investigation was not completed, Perez has not shown, for the same reasons discussed above with respect to the fifth *Harrington* factor, *see supra* Section III(A), a reasonable probability that, but for counsel's failure to conduct the medical investigation, the result of the trial would have been different—which

is required to succeed on an ineffective assistance of counsel claim.[7] In both *Sanders* and *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005), had counsel conducted an investigation, the defendant could have been convicted of a lesser-offense, *see Daniels*, 428 F.3d at 1209 (finding that counsel's failure to investigate defendant's mental health denied defendant the opportunity to rebut the government's theory that defendant acted with premeditation and malice), or have provided a complete defense. *Sanders*, 21 F.3d at 1461 (counsel did not investigate one suspect who confessed to having committed the murder at issue). This is not the case here.

The Court thus DENIES the Motion on this ground.

### D. The Court Need Not Reach the Cumulative Error Argument

For all the reasons set forth above, the Court does not find that Perez has shown that any of the alleged errors constitute errors. Accordingly, the Court need not reach the question of whether, taking all of the alleged errors together, a new trial would be warranted.

## IV. Conclusion

For the foregoing reasons, the Court hereby DENIES the Motion.

IT IS SO ORDERED.

Dated: April 17, 2024

MAAME EWUSI-MENSAH FRIMPONG
United States District Judge

---

[7] Because the Court has not found that the other three purported errors by counsel even constitute an error, the Court need not reach the question of whether taking all of Helfend's alleged errors together, Perez has made the requisite showing.